DANIEL E. HARRISON v. FITCH DEWEY ET AL.

*Accounting—Record—transcripts from books—Voluntary Compromise.*

Transcripts from partnership books and not the books themselves should be returned to the Supreme Court on an appeal from a decree on an accounting, unless there is something in the appearance of the books which is necessary to consider on questions of fraud or forgery, or some special difficulty. Otherwise parties ought not to be deprived of the custody of their books.

Where a partner had turned over to the firm certain securities to be used in paying for property purchased by them, and the firm credited him with them and guaranteed them to the party to whom they were given, and when a deficiency afterwards arose the partner who had been credited took back the title to a part of the mortgaged premises, it was to that extent proper to charge back the securities to him.

A fair compromise deliberately made by partners in settling their accounts ought not to be disturbed on a bill for an accounting, if the parties had had full opportunity to inform themselves and complainant does not show that there were false charges or omissions of specific credits.

Appeal from Ingham. Submitted April 15. Decided June 8.

BILL for accounting. Defendants appeal. Affirmed.

*M. V. & R. A. Montgomery* for complainant.

*Millard & Bean* for defendants.

CAMPBELL, J. Harrison filed his bill to get relief, as a retired partner, concerning his claims against the firm assets. From 1872 to 1877 he was a partner in a business in which there were some changes of ownership. In July, 1877, the firm consisted of Harrison, Dewey, Lane, Charles Palmer, and Foster R. Warren. The capital stock was $22,500, and the actual assets as inventoried were about $88,000, subject to not far from $16,000 debts. Assuming them to be worth their face, the assets beyond debts and capital would reach nearly $50,000, leaving each partner nearly $10,000.

In July, 1877, the defendants desired to form a new concern, and bought out Warren for the sum of $12,500, he accepting as his share beyond his capital stock $7500 as his interest in the profits. Harrison was also applied to, to sell out, and upon all the testimony we have no doubt that was the purpose of the arrangement which is set up in the bill, although he claims his sale was partial. Dewey insisted at this time that Harrison had overdrawn his accounts sufficiently to use up all his profits. Harrison claimed on the other hand that there was a very large balance in his favor. After an offer of $1000 had been refused, he finally accepted $2500. This he claims to have done under false representations from Dewey as to the state of the accounts and assets; and this bill is filed, practically for the purpose of rescinding that arrangement and obtaining an account of his proper share.

We have found much inconvenience resulting from the manner in which the testimony was put in. Instead of transcripts from such parts of the books as became material, the books were put in bodily, and no statement whatever was laid before us of Harrison's account, in the way in which it appeared on the books. It is not desirable or proper in ordinary cases to have the books themselves introduced and filed, unless there is something in their appearance which it is necessary to consider on questions of fraud or forgery, or some special difficulty. But where no such issue is raised, parties ought not to be deprived of the custody of their own books, and such accounts as are required should be transcribed.

In the present case the only issues presented by the pleadings or on the argument, which involved the correctness of the books, related to particular charges. It was not claimed the books themselves had been wrongly kept, or manipulated.

The chief item of dispute was a set of charges against Harrison for deficiencies in the proceeds of some securities which he turned over to his firm to be used in payment for some property purchased of Mr. Johnston. These securities amounted to $11,300 as credited. They were guaranteed to

Johnston by the members of the firm; and when the deficiency arose they were charged back, so far as necessary, to Harrison.

The testimony is not as clear as it should be on these items. It is admitted that Harrison, when the difficulty arose, took back the title to one portion of the mortgaged premises, and we think it very clear that as to this the charge back was right. The exact amount of the other deficiency is not shown, but it seems to have been not far from $2000.

No other charges claimed to be wrong have been brought to our attention.

Allowing the full amount of these Johnston charges to stand, the books show that in July, 1877, at the time of settlement, Harrison was indebted to the firm in excess of all his credits, in the sum of about $9639.71. That is the balance shown, and subject possibly to some miscalculations, is correct or nearly so. Dewey's statements, therefore, as to the condition of the books were not seriously erroneous. The additional $2500 which was paid to Harrison made the share which he drew of the profits more than $12000, and in excess of his proper share on the basis of the inventory, more than $2000, and more than $4500 beyond what Warren about the same time received for his equivalent share.

No items or specifications have been pointed out to us to indicate that there is any error in these figures. If they are correct he has on his own theory sustained no wrong, while on defendant's theory he has been largely overpaid.

We have referred to these figures chiefly for the purpose of showing that if there was a fair compromise, it ought not to be disturbed. It appears from Harrison's own showing that he knew the Johnston deficiencies had been charged against him some time before the settlement. He knew that Dewey, who acted for the others, claimed that there was nothing coming to him. On this dispute there was one offer made and rejected, and then a larger offer of a round sum of $2500 accepted. We see no reason to believe Harrison could not have informed himself fully at the time. Since this suit was commenced he has had access to the

books, and has pointed out no false charges, and no definite omissions of specific credits. We cannot assume that any exist; and we cannot properly speculate on peculiarities in the books which Harrison does not criticise or seek to have explained.

Whether the settlement was a better one or a worse one than Harrison was entitled to ask can make no difference if it was deliberately made. We think it was so made, and should stand.

The decree must be affirmed with costs.

The other Justices concurred.